### LAZARUS v. McDONALD et al.

(Circuit Court, W. D. Missouri, St. Joseph Division. June 22, 1899.)

ATTORNEY AND CLIENT—AGREEMENT FOR LEGAL SERVICES.

　　Defendants' intestate was largely interested in certain corporations which became insolvent, and both he and the corporations made assignments for the benefit of their creditors. In this condition of affairs, the decedent made a written proposition to complainant, a lawyer, which was accepted, to secure his services in effecting a settlement and composition with creditors. Such proposition or contract embraced two essential features—First, decedent was to be relieved from personal liability on all the debts. individual and corporate; and, second, the exclusive right to any surplus of the assets then in the hands of the assignees "not needed in satisfaction of the claims against those assets should inure" to decedent. It further provided that, "upon a settlement with the creditors * * * as above set forth, you are to receive a fee equal to twenty per cent. of the value of the estates * * * inuring to me as above." *Held*, that the formation of a corporation to which, with the assent of all the creditors. the assets in the hands of the assignees were transferred, and the acceptance by such creditors of notes of the corporation for their claims, on the basis of an agreed composition, with a further arrangement that on payment of all such notes the entire stock of the corporation should be transferred to decedent, did not entitle complainant to recover his fee, on the basis of the nominal excess of the assets of the corporation, as shown by its books, over its liabilities, at the time it was formed, but that the contract contemplated that both parties should share the risk of actually saving assets from the wreck, and complainant could not enforce his demand until the debts assumed had been actually paid, and then on the basis of the value of the assets remaining, and which "inured" to the decedent or his estate.

This was a suit in equity to establish the amount and to enforce collection of a contingent fee for legal services rendered under a written contract. Heard on exceptions to the report of a master.

Frank Haggerman, Oliver M. Spencer, and Hall & Woodson, for complainant.

Brown & Dolman, for defendants.

ADAMS, District Judge. This is a suit to establish a demand against the estate of Dudley M. Steele, deceased, and to discover assets for application to its payment. After the issues were made up in this case, the same was referred to Alexander Martin, Esq., as special master, to hear the evidence and report his conclusions of law and fact to the court. The hearing having been fully had before the master, the case is now before this court on exceptions to the report of the master filed herein. It appears that on June 4,

1894, the mercantile firm of Steele & Walker (composed of Dudley M. Steele and ——— Walker); and a corporation by the name of "Midland Coffee & Spice Company," in which Steele owned all the stock and for which he had incurred some obligations as indorser of its commercial paper; and Dudley M. Steele himself, who had a considerable estate, consisting of capital stock in a mercantile corporation known as "Steele-Smith Grocery Company," located at Omaha, Neb., some real estate, consisting of about 5,700 acres of lands in the state of Kansas, the building occupied by Steele & Walker, in St. Joseph, Mo., and some other unimportant pieces of land,—made their several general assignments, under the laws of the state of Missouri, for the benefit of their creditors. The cause of action sued on in this case arose out of an employment of complainant, who is a practicing lawyer in New Orleans, La., by Dudley M. Steele, in his lifetime, to perform certain legal services for him in the way of making a settlement with his creditors and extricating him from his financial difficulties. The contract of employment is found in a certain letter written by Steele to the complainant in the form of a proposition by Steele. It is as follows:

"Henry L. Lazarus, Attorney, New Orleans, La.—Dear Sir: After mature consideration, I have concluded to ask your services in an attempt to extricate the financial affairs of Steele & Walker and myself from their present condition. Whatever plan may be pursued, I shall and do require that I shall be relieved from my personal liability upon the debts of Dudley M. Steele and of Steele & Walker, including the indorsement by Steele & Walker and D. M. Steele for the Midland Coffee & Spice Co.; and, further, that the exclusive right to any surplus of the estates of Steele & Walker and D. M. Steele now in the hands of assignees, not needed in satisfaction of the claims against those estates, shall inure to me. If my services are desired after the composition is effected with the creditors of Steele & Walker and myself, I will, at a salary equal to any other business offer, give the business incident to the complete payment of the deferred portion of the indebtedness to be created my exclusive attention, and, pending negotiations for this settlement, I and my local counsel will render all necessary and appropriate assistance. I will, in any event, refund to you my proportion of all necessary traveling and contingent expenses incident to your coming to St. Joseph from New Orleans and the visiting of the various creditors. Upon a settlement with the creditors of D. M. Steele and Steele & Walker, as above set forth, you are to receive a fee equal to twenty per cent. of the value of the surplus of the estates of Steele & Walker and D. M. Steele inuring to me as above. If we do not readily agree upon the value of said surplus, it may be appraised by two appraisers, one chosen by each of us, and, in case of disagreement between the two we may select, they to select a third, and the three thus chosen, or a majority of them, to appraise said surplus, said appraisers to be all of St. Joseph and disinterested. One-quarter of the expenses and this compensation I shall expect you to take in the obligations of J. W. and S. A. Walker, in such form as you and they may agree upon, or in the sole obligations of J. W. Walker if S. A. Walker refuses to unite with him, and the remainder of this compensation I will provide for by allowing a reasonable time after this composition is effected and the remaining assets placed under my control. If you are unsuccessful in this attempt, my obligation under this proposition is limited to repayment to you of one-half your traveling and contingent expenses in attempting to effect the settlement.

"Very respectfully,                    D. M. Steele."

On receipt of this letter, complainant duly accepted employment thereunder, and proceeded to performance.

The plan advised by complainant, pursuant to the suggestions found in said proposition, is expressed in a communication pre-

pared by complainant, and addressed to D. M. Steele, Esq., to be signed by the creditors. This communication is as follows:

"St. Joseph, Mo., August 8th, 1894.

"Dudley M. Steele, Esq., St. Joseph, Mo.—Dear Sir: As creditors of the firm of Steele & Walker, D. M. Steele, and of the Midland Coffee Company, we submit for your consideration the following propositions, with a view to the adjustment of the indebtedness due by said parties: If a corporation shall be formed and organized with power to carry on the business of grocers and commission merchants, and with authority to acquire real estate and to dispose of the same, with a board of directors to consist of D. M. Steele, Milton Tootle, Jr., B. Weakley, Wm. B. Craig, and Chas. E. Jessopp, and said corporation organized at once, with D. M. Steele to be chosen as president. Milton Tootle, Jr., vice president, Wm. B. Craig, general manager, and Chas. E. Jessopp, treasurer and secretary, to serve for one year, or until successors or persons in substitution for them shall be selected. And if the corporation shall pass by-laws operating as a contract until the payment of the adjusted indebtedness, providing as follows: That the salaries of the officers shall be, president $5,000, general manager $3,000, secretary and treasurer $1,500, and not subject to change, except by alteration of the by-laws: and shall also pass by-laws providing that special meetings of the shareholders will be held at the place of business of the corporation in St. Joseph, Mo., and can be called at any time, on not less than twenty-four hours' notice, to be given by publication in a daily paper in St. Joseph, Mo., said notice naming the time for such meeting, signed by the holders of a majority of the stock of the corporation, and must be called by the secretary of the corporation by a like publication of a notice of not less than twenty-four hours, whenever he shall be directed so to do by letter or telegram addressed to him by the holders of a majority of the stock, or by the committee of creditors of said corporation hereinafter to be mentioned; and that the secretary shall give the notice for the time designated in such letter or telegram, provided the notice to be published be for not less than twenty-four hours; and, further provided, that at all meetings of shareholders each shareholder shall be entitled to one vote; that shareholders may vote by proxy, and that at all shareholders' meetings all votes shall be by shares only; and that at any such meetings the holder of a majority of the stock of the corporation may remove summarily any director or directors, officer or officers, employé or employés, of the company, and substitute other persons for them, and that the salaries of the removed parties shall instantly cease upon their removal; and that said by-laws, when adopted, shall only be subject to repeal or alteration by the vote of a majority of the stock of the corporation. And if the corporation shall, after its organization, execute and deliver into the hands of John S. Lemon, S. C. Woodson, and R. L. McDonald, a committee hereinafter mentioned, the promissory notes of said corporation, to the order of each of the creditors of Steele & Walker, D. M. Steele, and the Midland Coffee Company, referred to in the schedule hereto annexed as a part hereof, and any other claims of the parties mentioned in the schedule, or of others which the committee shall ascertain to be justly payable, upon the following basis of percentage of the debt of said creditors: On the paper of Steele & Walker, without other indorsement or security, fifty cents on the dollar; on the paper of Steele & Walker, with the indorsement of Dudley M. Steele, 70 cents on the dollar; on the merchandise accounts of Steele & Walker, thirty-seven and one-half cents on the dollar; on the obligations of the Midland Coffee Company indorsed by Steele & Walker, sixty-two and one-half cents on the dollar; on the obligations of the Midland Coffee Company indorsed by Steele & Walker and Dudley M. Steele, seventy-five cents on the dollar; on the merchandise accounts of the Midland Coffee Company, thirty cents on the dollar,—the said obligations of the corporation to be made payable to the creditors, respectively, divided into equal amounts, payable at six, twelve, and eighteen months, with interest at 5 per cent. per annum, and dated on the day of delivery. And if the corporation shall, at the same time, place in the hands of said committee a contract duly executed, for the benefit of all the said creditors who shall accept said notes and make the assignment to the corporation as hereinabove

stated, respectively, constituting a committee in behalf of said creditors of said corporation to supervise, direct, and control the corporate acts as hereinafter mentioned, and providing that said committee shall have authority to deliver said notes to each of said creditors upon the assignment to the corporation by said creditors or the committee herein provided for, respectively, of their claims against Steele & Walker, D. M. Steele, and the Midland Coffee & Spice Company, provided such assignment shall be made within ninety days after the delivery of the notes of said corporation; and if the assignments, respectively, are not made within said period, the notes that shall be applicable to said assignment shall be returned by the committee to said corporation to be canceled, it being distinctly understood that there is to be no assumption of interest or liability of said corporation for any of the debts or obligations of Steele & Walker, Dudley M. Steele, or the Midland Coffee Company. The necessary expenses of the committee shall be paid by the corporation. And said contract shall also provide that at least once every week the said corporation shall make a report to said committee, in form to be required by the committee, of all its receipts and disbursements, and of such other facts and accounts as the committee may desire. And that said committee shall approve orders for all goods purchased to replenish stock on the application of the president or general manager, and they may, at all times, apply all surplus funds of said corporation not necessary for the proper conduct of said business to the prepayment of said notes which shall have been accepted by the creditors, indorsing, or causing to be indorsed, such payments, with the time of the making thereof, on the back of the note on which the payments have been applied. And said contract shall further provide that said committee may, at any time, require that the president, or any officer or employé, shall be discharged, and any person or persons named by them substituted, and the board of directors shall be required to obey such direction given in writing within twenty-four hours after the same, and the salaries of such persons then shall cease; and that in like manner the said committee may, at any time, upon notice of twenty-four hours to the president of said corporation or its secretary or treasurer, require the business to be brought to an end, and thereupon it shall be at once brought to an end and wound up, under the supervision of the said committee, or any attorney or agent selected by them. And that any failure upon the part of said corporation to comply with any of said stipulations of said contract, and especially of the directions of said committee, shall be a ground for the appointment of a receiver or receivers, by a court of competent jurisdiction, to close the business of said corporation, and to apply the assets to the payment of the debts, and the receiver shall be named by said committee. And said contract shall further provide that said committee shall have authority, by an instrument of writing signed by them and for a limited period, to delegate to one or more other persons, in said instrument to be named, all or any part of their powers under said contract, and shall have power, at their discretion, to appoint or remove, or to appoint or reappoint, any person who they may select to act as an assistant manager in the establishment of said corporation, who shall render such services as he can in the conduct of its business, and shall have access, at all times, to all its books and papers, and shall receive a salary not to exceed one hundred and fifty dollars per month, to be paid to him by said corporation. That two members of the committee shall constitute a quorum for the transaction of the general business of said committee, and they may do all things and exercise all powers which the full committee could do or possess, save and except the removal of officers of said corporation or directing its liquidation, and that to do either of the things last named it shall require the consent of the entire committee. And if the corporation shall deliver to the committee the notes as mentioned, and shall cause all the capital stock of the company, with the exception of one share to each of the directors, to be placed in the name of some person, to be selected by the committee, on the books of the corporation, and said certificate to be indorsed and accompanied by irrevocable transfer in blank, and so delivered to the committee, and shall also cause to be delivered to the committee with the certificate the irrevocable powers or the proxies of the holders on said books to said committee, authorizing them, and each of them, to vote the stock at all stockholders' meetings, as long as

any of said notes remain unpaid, and shall provide by said contract to be made by the corporation that the stock shall be held by the committee as collateral for the payment of the notes, and that if default be made in the payment of the notes or any of them, or of the interest thereon, the committee may sell the stock, or so much thereof as may be necessary, at public auction, in the city of St. Joseph, Missouri, first giving notice of twenty days' publication in a newspaper published in the city of St. Joseph, and apply the proceeds to the payment of the notes unpaid and interest pro rata. And said contract shall provide that the duties of said committee shall be gratuitously performed, and that no liability or responsibility shall attach to them by reason of any errors or omissions, and, in case any vacancy occurs in the committee by death, inability, refusal to act, or act further, or from any other cause, the vacancy or vacancies may be filled by the remaining members, and so on from time to time, and the committee as then constituted shall have all the powers of the committee made in this letter. And that the contract shall also provide for the continuance of the committee until all said notes shall be paid, and, when the notes have been paid, then the committee shall transfer or cause to be transferred said stock to D. M. Steele or to any other persons whom he may designate in writing addressed to said committee. That pending the organization of the corporation contemplated by the within letter we agree to assign our claims to the committee provided for herein, authorizing said committee to accept from said corporation, when organized, its obligations for the amount to which we may be, respectively, entitled, upon the basis of the adjustment herein, and payable at the times herein stated; the said committee being invested with full power and authority to use our said claims so assigned to effectually carry out the terms of adjustment proposed herein."

It took some time to secure the consent of all the creditors to this plan, but it was finally so accomplished that on December 18, 1894, complainant had succeeded in lodging the control of the claims of all the creditors in the hands of the committee provided for in said plan. A few days before that, complainant had completed the organization of a corporation contemplated by said plan, by the name of "D. M. Steele Mercantile Company." This corporation soon executed and delivered to the committee of creditors its obligations, for the benefit of the creditors of Steele and Steele & Walker, at the purchase or adjustment price of their claims. These obligations were in three sets of notes, maturing, respectively, in 6, 12, and 18 months from date, and bearing interest at the rate of 5 per cent. per annum. On the same day, to wit, December 18, 1894, all the assets, or the proceeds of such as had been reduced to money by the assignees under the state assignments, were, by appropriate orders of the court in charge of such assignment proceedings, turned over to said corporation. By this arrangement, the debts of Steele and Steele & Walker, as scaled, were assumed by the mercantile company. Steele was personally relieved therefrom, and the assets formerly belonging to the assigned estates were made subject to their payment, in accordance with the general scheme of the plan already set out.

When the mercantile company opened up its books, it stated, in appropriate debit and credit columns, its assets and liabilities. Its assets consisted of the cash turned over to it by the assignees, some undisposed of merchandise, accounts, bills receivable, real estate located in Kansas and St. Joseph, and certain other property, generally described as "cash, notes, and stocks resulting from the assignment of Dudley M. Steele," etc., aggregating the total sum of

$619,205.79. Its liabilities were stated to be the bills payable just then issued in settlement of the claims of the creditors of the assignors in said assignments, amounting (with a small item of cash) in the aggregate to $457,720.26. These figures show a balance of assets over liabilities of $161,485.53. The valuations resulting in the foregoing figures and balance were placed upon the assets by the committee of creditors, and with the knowledge and acquiescence of Steele. Mr. Lazarus, the complainant, was, at the time the foregoing entries were made, in New Orleans, his home. Mr. Jessup, the secretary of the mercantile company, on December 27, 1894, wrote complainant as follows: "I enclose a statement of the assets on hand when we took possession; also the cost of adjustment, which I trust will be satisfactory. If not so, let me know." This inclosure consisted of the figures above given, showing the balance of $161,485.53, as aforesaid. Complainant was then a director of the mercantile company, and as such presumably interested in the showing made by its books.

There is much evidence in the record relating to the value of several items of assets, and also relating to the participation of Steele in fixing the same. The complainant claims that these figures showing this balance of $161,485.53 so sent to him by the secretary of the mercantile company is a stated account, within the meaning of the law, and that, within the purview of his contract with Steele, the balance of $161,485.53 therein shown is the value of assets "inuring" to Steele, of which he, by virtue of his contract, is entitled to 20 per cent., and it is on the theory of such claim being valid that he has exhibited his bill of complaint in this case. It is fair to state that in the argument of the case counsel have not confined themselves strictly to the theory that this balance of $161,485.53 is an account stated, but have contended that it was at least such a representation and such a holding out of the situation as now estops the administrator of the estate of D. M. Steele, deceased, from denying that it is the true value of the surplus inuring to him, within the meaning of complainant's contract of employment.

I have given the evidence bearing on this phase of the case careful consideration, and have attentively considered the arguments and briefs of counsel on the question, and cannot escape the conviction that the complainant is wrong in the conclusions he deduces. The master's report on this issue is, in my opinion, fully supported by the facts. He says: "Neither do I find in the testimony sufficient evidence to support the conclusive effect of a stated account. I do not find that Mr. Steele and the complainant ever got together in an accounting which had reference to a settlement of the surplus under the contract, or that any of their admissions of value or amounts were ever made with reference to an agreement between them as to the value of the surplus, as contemplated by the contract." He also says (in which I concur) "that the valuation of December 18, 1894, was made with reference to the opening of the books of the liquidating company. It was done principally by other officers of the company or other persons. It was necessary to be done in order that a proper set of books might be opened and the business of the

corporation intelligently conducted." It appears to me clearly from all the evidence, from the situation of the parties, and the necessities of the business, the purposes to be accomplished, and all the other surrounding facts, especially from the fact that the entries were made immediately after the formation of the liquidating corporation, and before the time any efforts had been made towards disposing of any of the assets by the liquidating corporation, that the entries so made in the books, and so forwarded to complainant, could not, in the nature of the case, relate to the "surplus," within the meaning of complainant's contract of employment, but were intended for other obvious and necessary purposes, as stated by the master in his report. So far, therefore, as this action is concerned, there is no estoppel against the defendants requiring proof of the real surplus, within the true meaning of the contract between complainant and Steele. Notwithstanding the manifest general theory of the bill of complaint is to plead complainant's rights predicated upon the existence of such an account stated, or such an estoppel, the master heard all of the evidence relating to the real value of the surplus as of December 18, 1894, and allowed the complainant the full benefit of the result of such inquiry, in the same manner as he would have done if the bill of complaint had counted upon such a state of facts. It therefore becomes necessary to consider the case upon this theory also.

It is contended by complainant's counsel that, by the true interpretation of the contract of employment, complainant is entitled to a fee equal to 20 per cent. of the value of the surplus as of December 18, 1894, the date when Steele was relieved of personal liability for his debts by the act of his creditors accepting the obligations of the mercantile company therefor. It is contended, on the other hand, by the defendants' counsel, that, according to the true meaning of the contract, the complainant is entitled to nothing until the debts of Steele, even though assumed by the mercantile company, are fully satisfied out of the assets devoted to, and pledged for, their ultimate payment; and that there is no way of ascertaining the surplus inuring to Steele, 20 per cent. of the value of which was to be the measure of complainant's rights, until such debts were actually paid and satisfied.

These contentions present the crucial question of this case. The proposition of Steele to the complainant of date July 4, 1894, already set out in full, states two essential requirements to any "plan" which the complainant might adopt. These are as follows: First, Steele required that he should be relieved from personal liabilities for his own debts, and those of Steele & Walker, including his indorsements for the Midland Coffee & Spice Company; and, second, Steele required, using his own words, that the "exclusive right to any surplus of the assets of Steele & Walker and D. M. Steele, now in the hands of assignees, not needed in satisfaction of the claims against those assets, shall inure to me." He next suggested that the plan to be adopted by complainant will involve deferring the payment of a portion of the indebtedness to some future time, and offered to give the business suggested to be incident to paying such deferred

debts his exclusive attention. The plan had evidently been discussed between complainant and Steele, as will presently appear, from its general harmony with the proposition.

The clause of the contract relied on by complainant to fix his compensation is as follows: "Upon a settlement with the creditors of D. M. Steele and Steele & Walker, as above set forth, you are to receive a fee equal to twenty per cent. of the value of the surplus of the estates of Steele & Walker and D. M. Steele inuring to me as above." Inuring to me "as above"; that is to say, such surplus thereof as is not needed in satisfaction of the claims at such time as the payment of the same, or portion thereof, might be deferred. Again, in the last clause but one of the proposition, after stipulating that complainant should take one-fourth of his compensation in some obligations of J. W. and S. A. Walker, he (Steele) who was making the proposition, says: "The remainder of this compensation I will provide for by being allowed a reasonable time after this composition [here again alluding to some plan for composition obviously having been before that time talked about] is effected, and the remaining assets placed under my control." These provisions of the proposition, duly accepted by the complainant (which are the controlling ones on the question now under consideration), seem to me to clearly indicate that the parties intended to devise such a scheme or plan as would subject all the property to the payment of the debts of Steele and Steele & Walker, as they should ultimately be scaled and adjusted, and that after such debts should be paid and extinguished, and the property or some part of it should be relieved from any claim or liability therefor, the same should "inure" to Steele, and then, and not until then, should complainant be entitled, as his fee, to a sum equal to 20 per cent. of the reasonable value thereof, namely, of such as should so inure to Steele after being relieved of the obligation fixed upon it for the satisfaction of the debts.

This construction of the contract becomes more apparent, if possible, by a consideration of the "plan" contemplated to be made in the proposition, and which was soon afterwards devised and put into execution by the complainant. Without attempting to analyze in full this plan (already set out), it is sufficient for the present purpose to say that it clearly contemplates and requires the formation of a corporation with power to acquire the personal property and real estate formerly belonging to the assignors in the assignments already mentioned, and at that time in the hands of their assignees; the assumption by such corporation, with the consent of the creditors, of the payment of the debts of Steele and Steele & Walker, as the same should be scaled and adjusted and put into the form of notes, according to the scheme in said plan elaborated; the appointment of a committee of the creditors to supervise, control, and direct all corporate acts, with power in such committee to remove officers at any time, to take charge of the business, and wind it up with or without the intervention of a receiver, and, in the exact language of the plan itself, "to apply the assets to the payment of the debts." This committee was also to have an irrevocable power of attorney, or proxy, from any person in whose name the stock might stand, to

vote the stock at all stockholders' meetings, "as long as any of said notes should remain unpaid." More than this, all the capital stock was, by express provision of the plan, to be turned over to the committee, and held by the committee as collateral for the payment of said notes and accruing interest, with power in the committee to ,sell the same if necessary, and apply the proceeds thereof to the payment of any of said notes which might remain unpaid. The plan finally provides as follows: "For the continuation of the committee until all of said notes shall be paid, and, when the notes have been paid, then the committee shall transfer said stock to D. M. Steele, or to any other persons whom he may designate in writing addressed to said committee." This plan, it seems to me, beyond any question, contemplated at the time it was devised the actual payment and satisfaction of all notes to be given by the mercantile company in payment of the indebtedness of Steele and Steele & Walker before any of the property should inure or be turned over to Steele. Not only is this so under the general law governing the rights of creditors and stockholders in corporations, but it is so explicitly and effectually expressed by so many emphatic and otherwise unintelligible provisions of the plan, culminating in one expressly binding the committee not to deliver any part of the capital stock to Steele until the notes should be fully paid, that it is incomprehensible to me how anyone can seriously contend that any of the property, or any right thereto or control over the same, was to vest in or inure to Steele until after all the adjusted debts were not only settled (that is to say, settled so as to relieve Steele from personal liability therefor), but actually paid and satisfied, so as to entitle him to the legal right and actual possession of the remainder of the property not needed for their satisfaction. The contention of complainant's counsel that the clause of the proposition as follows: "Upon a settlement with the creditors of D. M. Steele and Steele & Walker, as above set forth, you [complainant] are to receive a fee equal to 20 per cent. of the value of the surplus," etc.,—fixes the time of the settlement so made with the creditors as to relieve Steele from liability therefor, irrespective of whether the debts were then paid or not, as the time when complainant's right to payment for his services accrued, is, in my opinion, unwarranted. It is at war with the entire theory of the proposition and plan, and with the purposes to be accomplished by Steele in and by their execution. That theory, and the manifest purpose of the parties at the time, was that all the property was first effectually dedicated to, and pledged for the payment of, the adjusted debts; and, with respect to complainant's fee, the theory clearly was that complainant was to have a fee equal to 20 per cent. of the value of such property as might be saved to Steele after the debts should be paid and first satisfied out of the property. The language relied on by complainant's counsel must be read in the light of its surroundings. The four corners of the proposition must be examined, and, if necessary, all the provisions of the plan made by the parties interested in the execution of the scheme suggested in the proposition must be considered. In the light of these recognized rules of construction, the words relied upon by complainant's counsel as follows: "Upon

a settlement with the creditors of D. M. Steele and Steele & Walker, as above set forth, you are to receive a fee equal to 20 per cent. of the value of the surplus of the estates of Steele & Walker and D. M. Steele inuring to me as above,"—have a clear and distinct meaning. The "settlement" here referred to is the one "above set forth," namely, one which, after applying the property "in satisfaction" of the claims against the assigned estates, will leave some residue to "inure" to Steele, and an amount equal to 20 per cent. of this residue so inuring to Steele, after the debts are paid, is to be the fee of the complainant. Accordingly, it is my opinion that, agreeably to the original intention of the parties, complainant was to have no fee, and no right to a fee, until a settlement and satisfaction of the creditors' demands should have been so made as to demonstrate that there was a surplus, which alone was to measure the complainant's rights.

It may be that, under the construction now given to complainant's contract, the fruition of his purpose is deferred longer than he desires; but when it is considered that he was to become, and did become, a director of the corporation, and an adviser to the committee of creditors, and thus always in a position to scrutinize the liquidation process on which his compensation depended, it seems that the postponement of his right to a fee to the end of the liquidation, under such circumstances of surveillance on his part, was not an unreasonable condition for him to consent to in his contract, and is not an unjust condition for him to abide by. That the construction put upon complainant's contract is correct appears to me also most conclusively from the conduct of the parties in connection with its performance. On December 18, 1894, the corporation having been duly organized, the property in the hands of the assignees was turned over to it, its notes executed for the adjusted demands of the creditors, and the liquidation was begun under the scheme with all its attendant safeguards. The stock which, by the terms of the plan, was to be issued provisionally to a certain party, to be selected by the creditors, and then to be indorsed and delivered to the creditors' committee, with irrevocable powers of attorney to vote and use the same to accomplish the purposes of the plan, was issued and handled somewhat differently than the plan provided, but not so as to materially disturb or affect the supervisory control of the committee of creditors over it, or the bearing which the provisions of the plan legitimately have in determining the original intent of the parties with respect to complainant's rights under the contract of employment. There is, however, one feature of the treatment of the stock which attracts attention at once.

Soon after the incorporation of the mercantile company, which was capitalized at $100,000, with 1,000 shares of stock, of the par value of $100 each, the complainant caused to be transferred to himself and to his order 200 shares thereof. He, having before that time announced that he was going to give his wife one-quarter of his fee, caused a certificate for 50 shares to be issued in her name, and the balance of 150 shares to be issued to himself directly. These certificates he took possession of and retained until this suit was instituted, when, in his bill of complaint, he tendered the same to the court for

such disposition as to the court seemed proper. There is no evidence of any kind that at or before the time of securing this stock complainant ever demanded his fee in money as a right then accrued to him. There is a conflict of evidence as to what was said by the parties at the time this stock was taken by him. Complainant claims that he required and secured the stock as collateral security for the payment of his fee. The defendants claim that he required and secured it as satisfaction for his fee, or, at least, as a conclusive evidence of his right in the property. I have given all the evidence bearing on this subject careful consideration, and, while the witnesses vary somewhat in the expression of their recollection as to what was actually said at the time, there are several uncontradicted physical facts, and necessary conclusions from them, which induce me to believe that the stock was taken at the time by complainant as a conclusive evidence of his rights under his contract of employment, and as a conclusive demonstration that the construction already placed on said contract is correct. These facts are: First. Complainant requested and received the issue of 50 shares of the stock to his wife by name. This is a circumstance tending to show that complainant was not taking the stock as collateral security for his fee or that due to his law firm for the services rendered. Second. The amount of the stock secured by him was the exact proportion of the entire issue which was to measure the amount of his fee, 200 shares being 20 per cent. of the total issue, and the amount of the stock which he caused to be issued in the name of his wife was the exact proportion of his fee which he intended to give to his wife. Third. The total issue of stock in law, as well as by many persuasive evidences of the understanding of the parties already considered, represented the exact amount and value of the property which was to inure to Steele by which the complainant's compensation was to be measured. Steele was to get all the property after the debts were satisfied; the stock represented this, and nothing more or different. It stood pledged by the plan, as well as by fixed rules of law, for the payment of all such debts before its value to the shareholders could be estimated, and of this value complainant was to have 20 per cent., and this he accurately secured when he took the stock corresponding to that portion of the value. Fourth. Self-evidently, this stock could be of no substantial value as collateral security. It had no value in itself, except one burdened with the payment of debts amounting at that time to more than the entire capital of the corporation, for the payment of which all the stock had, by specific provisions of the plan, been pledged as collateral. It had a rational utility for measuring the rights of the parties, and I prefer to impute to intelligent men such use of it, rather than the irrational, illogical, and inharmonious use, now insisted upon by complainant's counsel. Further than this, the evidence of the sayings of the parties at the time, considered in the light of all the circumstances already alluded to, in my opinion, conduce to the same result.

Another undisputed fact brings me to the same conclusion. On the same day that complainant took the 200 shares of stock, Mr. Steele, at the request of complainant, executed three promissory

notes, payable to complainant, for $4,000, $3,000, and $3,000, respectively, maturing in three, six, and nine months, respectively. These notes were delivered to complainant, who, simultaneously therewith, entered on the back of the certificate for 150 shares of stock issued to himself, the following indorsement, which was signed by him; that is to say: "The interest of H. L. Lazarus herein is to be charged with the following notes, when paid: One note, $4,000, due in three months from February 23, 1895; one note, $3,000, due six months from February 23, 1895; one note, $3,000, due nine months from February 23, 1895." These notes were discounted by complainant, and duly paid by Steele; the money, with the exception of $2,000, being paid by the mercantile company, and charged to him on its books. It is conceded by all that this money was advanced on account of complainant's fee. On the theory that the stock was given for the fee, or to represent the fee, a reasonable explanation is afforded for this indorsement on the back of the certificate. Otherwise, as it seems to me, it is without meaning. It is not usual to indorse on paper held as collateral merely the credits to which the principal obligation is entitled. On the contrary, if the paper on which it is indorsed is the evidence of the principal obligation, it affords the most appropriate place to make an entry affecting that obligation. Again, it is to be noted that complainant in making the indorsements says that his "interest" in the stock is to be charged with the amount of the notes when paid. This language could hardly have been employed had he owned no interest in the stock itself, other than that contingent kind which, in law, attends the holding of securities as collateral for the payment of some other obligation.

The rational and probable view of this transaction, in my opinion, is that complainant recognized the fact that the stock held by him represented his interest,—that is, 20 per cent. of the value of the surplus saved; and inasmuch as Steele, who was to be his debtor if there should be any salvage, had by his notes paid $10,000 on account of that obligation, it was appropriate to indorse the same on the back of the certificate, so that, when the same should be presented for participation in ultimate net profits, it should be charged, as between the complainant and Steele, with what Steele, out of a disposition to favor the complainant, had seen fit to advance him.

From the foregoing conclusions, it follows that the complainant cannot maintain a suit against the defendant, as administrator of the estate of Steele, deceased, for the recovery of money due him under his contract of employment, until the debts assumed by the mercantile company are so paid and satisfied as to discharge the property of the mercantile company from liability therefor, in order that it may be determined how much, if any, property "inured" to Steele, within the purview of the contract of employment under consideration. It may here be remarked that it is doubtful whether the complainant, in view of his having taken 20 per cent. of the capital stock of the mercantile company in the way and manner and for the purposes already stated, can have any redress now, except by a bill (if necessary) to wind up the affairs of the corporation in which he is interested. But, having treated the transaction of taking the stock

by complainant more as evidence bearing upon the construction to be placed upon the original contract of employment, I do not deem it necessary or advisable to express any further views as to its effect.

The question of fact now to be determined in settling complainant's rights, under the bill in this case (most liberally construed), is whether, at the time of the institution of this suit, any property had inured to Steele, or his personal representatives, within the meaning of the contract of employment, as hereinbefore interpreted. This question is of easy solution, in the light of the restatement of the assets and liabilities of the mercantile company made by the parties in interest on June 23, 1896, about a month before this suit was instituted. It appears from that statement, in the making of which the complainant participated, that the liabilities of the mercantile company were then $72,816.83. The liabilities consisted partly in a renewal of some of the notes of the mercantile company given for the third or final installment in settlement of the original obligations of Steele and Steele & Walker, in notes executed for money then borrowed to pay some of the original notes, and also in some of the original notes which had before that time matured and been extended. But whether these liabilities, or any of them, took on a new dress, or remained as originally evidenced, they still were, in substance and effect, the obligations of the mercantile company as originally undertaken and assumed in settlement of the debts of Steele and Steele & Walker. The assets on hand at the time of this restatement, June 23, 1896, consisted of a body of five or six thousand acres of land in Washington and Republic counties, in the state of Kansas; the business house formerly occupied by Steele & Walker; some unimproved lots in the city of St. Joseph; some defaulted notes secured by mortgages on Kansas land before then sold on credit; with some other property of small amounts, consisting of accounts, stocks, and $1,800 in cash. While the evidence concerning the actual value of these assets is conflicting, it establishes beyond question, I think, that they were not then at all available for use in settling the indebtedness for which they practically stood pledged, and that if they had been sold at public sale they would not have realized an amount equal to the indebtedness itself. In fact, most of the witnesses say that there was no sale for such assets possible at the time their testimony was taken in this case, and one witness (Mr. Wheeler), a merchant of standing and character in St. Joseph, who was one of the assignees in the prior assignments made by Steele and Steele & Walker, said, in giving his testimony, that he would not take the assets "as a gift, and pay the debts, $75,000."

Enough has already been said to show that at the institution of this suit there was a large amount of indebtedness owing by the mercantile company for the payment of which its property and assets stood charged, and that, therefore, within the true meaning of the contract of employment as hereinbefore construed, no assets had "inured to Steele," and no reasonable time had elapsed for Steele or his administrator to pay complainant, after "the remaining assets" had been placed under his (Steele's) control. The condition of things at the time this suit was instituted well illustrates the inequity of

complainant's case; for, should he now be allowed to recover a money judgment based upon any estimated value of the assets, whether as of December 18, 1894, or even as of the date of the institution of this suit, he would subject the estate of Steele to all the risk and loss incident to a forced sale of the assets, if insisted upon by creditors, or to the necessity of negotiating an extension of time for settlement in order to give the administrator an opportunity to speculate on an improved market, and in the end possibly no assets would in fact be saved, and therefore none would inure to Steele, and yet he (complainant), in direct contravention of the governing principle of his contract, would have safely secured his own fee calculated upon false premises. The plain theory of the contract of employment was that both parties should take the risk of actually, not theoretically, saving assets from the wreck. The present theory of complainant is that Steele's estate assumed all that risk.

Considering the fact that complainant, through the generosity of Steele, in making an advance payment on account of his fee, has already received $10,000, and that, too, at a time when he was not entitled thereto under the true interpretation of his contract, and to which the sequel may show he never would have been entitled, and considering the further fact that Steele, in his lifetime, fully performed his part of the contract by paying complainant all his expenses, in no small amount, it is my opinion that it is with little consideration and no equity that complainant now, before the liquidation is finished, and before it is known whether any assets are or will be saved to Steele's estate, exhibits his bill to fix his compensation, and secure a judgment therefor, which he may make out of general assets, even if nothing is ever saved from the particular assets in question, or to so fix his judgment as a lien upon all the stock of the mercantile company now held by one of the defendants for the estate of Steele that the probable result will be that, if perchance any assets are finally saved, the entire amount and value thereof will be taken to satisfy complainant's moiety of 20 per cent.

The foregoing views would dispose of the case, were it not for the fact that complainant seeks, by his bill, to establish a demand for $7,000 for legal services rendered by him to Steele other than such as were covered by the contract of employment already considered. The several items of services for which this aggregate sum is charged by complainant were fully considered by the master, and his conclusion as to each and all of them is that the same were rendered either to or for the benefit of the mercantile company or Steele under such circumstances as warranted the conviction that they were intended to be included in the services required by the contract of employment, and certainly with no intention, at the time of rendering the services, on the part of the complainant, to make any charge therefor against Steele. In this conclusion of the master with relation to the charges for extra services I fully concur, and as a result conclude that complainant has no legal or equitable right against the estate of Steele to recover for any such services.

In view of the foregoing considerations, the master's conclusion that complainant was entitled to have the surplus ascertained and ap-

praised as of the date of December 18, 1894, when Steele's debts were adjusted, is, in my opinion, erroneous.

The large amount of testimony taken; the variety of opinions as to values; the differences of witnesses as to what was and what was not assets; the maturity or extension of the payment of debts; and evidence as to what amount of assets would be required to satisfy and discharge the indebtedness,—each and all of these things presented to the master's consideration a perplexing problem, and one which, in my opinion, he properly solved, on his theory of fixing the complainant's rights according to the probable surplus estimated upon values as they existed on December 24, 1894; so that, if my construction of the contract is incorrect, and if the complainant, in view of all the facts and circumstances of this case, has any equity at all, the facts of the case, as found by the master, would justify a decree as recommended by him.

Complainant in his bill seems to stake his right of recovery solely on the allegations showing an account stated between him and Steele in his lifetime. If the parties had reached an agreement upon a surplus, within the true meaning of the contract of employment, and with reference to that contract of employment, such fact would estop the defendants from now gainsaying the conclusion so reached by the parties. Such being the showing made by the bill, the fact that a demurrer was once overruled affords no justification for the argument of counsel for complainant that the construction of the contract, as now claimed by them, has been once judicially determined.

The construction of the contract arises and becomes necessary in disposing of the case on a theory which complainant has invoked as a substitute for the disapproved theory of the bill as filed, and notwithstanding the ruling upon the demurrer, which was without doubt correct, the construction of the contract, for the purposes of the case as made by the evidence, now becomes, not only proper, but necessary. Considering the whole case; the true construction of the contract of employment; the obligations imposed upon complainant thereby; the limitations of his rights thereunder; the theory of the bill as filed being disapproved; the complainant's receipt of 20 per cent. of the capital stock of the mercantile company in the way and manner and for the purposes already stated; complainant's receipt of $10,000 on account of his compensation in the way and manner already stated,—I am of the opinion that there is no equity in the bill, and that in any event it is prematurely brought. This conclusion results in a disposition of the case without the necessity of inquiring into the issues made concerning the property alleged to have been withheld from the mercantile company by Steele, or concerning the alleged fraudulent transfer of the stock of the mercantile company to defendant Weakley.

I find, on examining the pleadings, that there is a cross bill filed by defendant McDonald, as administrator of the estate of Steele; but as counsel have not in argument pressed any consideration of this cross bill, and as it is, in the light of the result already reached, of doubtful propriety in the case, I have concluded to enter an order dismissing it, without prejudice, however, to the right of the adminis-

trator to renew his claim as there stated in any subsequent litigation, if he be so advised to do.

In accordance with the views above expressed, the second and fifth exceptions of the defendants Susan H. Weakley, Armstrong B. Weakley, and the D. M. Steele Mercantile Company to the report of the master are allowed. The other exceptions of said defendants are disallowed. All the exceptions of the complainant are disallowed. The recommendation of the master is disapproved. The cross bill of Rufus L. McDonald, administrator, is dismissed without prejudice. The temporary injunction heretofore granted herein is dissolved, and, the court being now in possession of the whole case, a decree will be entered conforming to the views herein expressed, dismissing the bill.